IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


SHANE E. HUGHES                                                        PLAINTIFF


         v.                              CIVIL NO. 20-2018


ANDREW M. SAUL, Commissioner
Social Security Administration                                        DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Shane E. Hughes, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

### I.      Procedural Background:

Plaintiff protectively filed his current applications for DIB and SSI on January 10, 2017, alleging an inability to work since January 25, 2011,[1] due to severe anxiety, severe mood swings, post-traumatic stress disorder, severe headaches, constant back pain, constant shoulder pain, carpal tunnel both wrists, depression, schizophrenia, and a sleep disorder. (Tr. 78-79, 221, 228). For DIB purposes, Plaintiff maintained insured status through September 30, 2016. (Tr. 14, 238). An

---

[1] Plaintiff through his counsel amended his alleged onset date to August 23, 2016. (Tr. 13, 52).

administrative hearing was held on December 5, 2017, at which Plaintiff appeared with counsel and testified. (Tr. 37-75).

By written decision dated October 15, 2018, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 16). Specifically, the ALJ found Plaintiff had the following severe impairments: dorsalgia, migraine headaches, obesity, a history of right shoulder and hernia repair surgery, bipolar disorder, a major depressive disorder, and a generalized anxiety disorder. (Tr. 16). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 16). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs, he can never climb ladders, ropes and scaffolds, and he can occasionally balance, stoop, kneel, crouch and crawl. He can occasionally reach with his right upper extremity, and he must avoid concentrated exposure to hazards. He is further able to perform unskilled work where interpersonal contact with coworkers and supervisors is incidental to the work performed and there is no contact with the public, where the complexity of tasks is learned and performed by rote with few variables and little judgment required, and where the supervision required is simple, direct and concrete.

(Tr. 19). With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a blending tank tender helper, a groover and stripper operator, and a laminating machine off bearer. (Tr. 30).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which after reviewing additional evidence submitted by Plaintiff denied that request on December 7, 2018. (Tr. 1-6). Subsequently, Plaintiff filed this action. (Doc. 2). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 15, 18).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    **Evidence Presented**:

At the administrative hearing held before the ALJ on December 5, 2017, Plaintiff testified he was thirty-nine years of age and had obtained a high school education. (Tr. 44). The record reflects Plaintiff's past relevant work consists of work as an assembly press operator. (Tr. 46, 68).

The pertinent medical evidence in this case reflects the following. On September 1, 2016, Plaintiff was admitted into Ambrosia of the Palms Beaches for treatment of alcohol, methamphetamine, and cannabis dependence. (Tr. 410-448, 562-572). Plaintiff reported he was seeking treatment because his drinking was out of control. Plaintiff reported he wanted help with coping with his anger. Plaintiff indicated he would use money from his job as a handy man to buy substances. Plaintiff reported he drank twelve to fifteen beers daily for the last seven years and smoked daily. Plaintiff indicated he was feeling remorseful and upset by the fact that he had been in jail for not making child support payments when he did not have any income. Treatment notes indicated Plaintiff responded well to clinical intervention. Plaintiff was noted to have break throughs in dealing with his impulse control issues and anger. Plaintiff did well in group sessions by sharing struggles and providing appropriate and relevant feedback to others. Plaintiff was discharged on October 8, 2016, in stable condition.

On October 14, 2016, Plaintiff underwent a diagnostic evaluation at the Western Arkansas Counseling and Guidance Center following inpatient treatment at a facility in Florida. (Tr. 598-601). Plaintiff reported he and his wife drove back to Fort Smith, from Florida, a few days ago. Plaintiff was found to have a calm mood and appropriate affect. Plaintiff's attention and

3

concentration were noted as normal. Plaintiff reported if he had the means he would like to travel. It was recommended that Plaintiff start therapy.

On November 1, 2016, Plaintiff was seen at the Western Arkansas Counseling and Guidance Center for an assessment. (Tr. 465). Ms. Abby Rundell noted Plaintiff presented as friendly and social. Plaintiff indicated he was seeking a substance abuse assessment as recommended by Ambrosia. Plaintiff reported he last used alcohol or an illegal substance in August of 2016. Plaintiff was scheduled with a therapist for November 11, 2016.

On November 7, 2016, Plaintiff was seen by Dr. Brandi Guthrey as a new patient. (Tr. 455-458, 462-463). Plaintiff complained of bilateral back pain and right shoulder pain. Dr. Guthrey noted Plaintiff had a history of alcohol and substance abuse and had recently been discharged from inpatient rehab. Plaintiff reported he was seventy days sober. Plaintiff also complained of memory issues and speech difficulties which he attributed to concussions from when he played football in high school. Plaintiff also reported mood changes and insomnia. After examining Plaintiff, Dr. Guthrey assessed him with backache, mixed anxiety and depressive disorder, vitamin D deficiency, concussion injury of the brain, and shoulder pain. X-rays of Plaintiff's spine revealed no significant radiographic abnormalities. Dr. Guthrey recommended a MRI of the right shoulder and a MRI of the brain. Plaintiff was prescribed Seroquel and Topamax.

On November 16, 2016, Plaintiff was seen for an individual therapy session with Joanie Henry, MS, LPC, LADAC, AADC, to discuss his mood and behavioral symptoms. (Tr. 853-855). Plaintiff reported he attended his grandmother's funeral the previous Saturday, and that had been difficult for him. Plaintiff reported he had isolated more than usual and was thinking about going

to rehab again. Plaintiff reported he had come home from rehab to spend time with his family and be home for the holidays. Ms. Henry noted Plaintiff had made fair progress.

On December 1, 2016, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 856-857). Ms. Henry noted Plaintiff's report that they had started to clean out his grandmother's house.  Plaintiff reported he struggled with his parents not wanting to get rid of anything. Plaintiff indicated he had been clean for ninety-three days and that he was doing okay. Ms. Henry noted Plaintiff had made fair progress.

On December 8, 2016, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 858-859). Plaintiff reported depressive and anxiety symptoms. Plaintiff indicated he was willing to try meditation, deep breathing, and journaling. Plaintiff reported he was sometimes afraid his anger would get out of control. Plaintiff thought his medications were working well for him. Ms. Henry noted Plaintiff had made fair progress.

On December 15, 2016, Plaintiff was seen by Dr. Guthrey.  (Tr. 453-455).  Plaintiff reported he continued to have shoulder pain worse with abduction, as well as internal rotation, and lower back pain with radiation to his lower extremities, bilaterally.  Plaintiff reported improved sleep with Seroquel.  Plaintiff wanted to discuss a vasectomy. Upon examination, Dr. Guthrey noted Plaintiff was healthy-appearing, well-nourished and well-developed.  Plaintiff ambulated normally.  Plaintiff was noted to have poor insight but a normal mood and affect.  Plaintiff exhibited normal recent and remote memory. Dr. Guthrey noted Plaintiff had limited range of motion.  Plaintiff was assessed with shoulder joint pain and given an orthopedic referral.  Plaintiff was also referred to a urologist to address a vasectomy.

5

On December 22, 2016, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 860-861). Plaintiff reported things were going well. Plaintiff reported his old boss had called and offered him his old job. Plaintiff accepted the offer. Plaintiff's Paxil was increased as Plaintiff's wife indicted Plaintiff was having nightmares. Plaintiff did not remember having them. Ms. Henry noted Plaintiff had made fair progress.

On January 3, 2017, Plaintiff underwent a MRI of the brain that was unremarkable. (Tr. 458-461).

On January 5, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 862-863). Ms. Henry noted Plaintiff discussed family dynamics, and how he was abused as a child. Plaintiff reported he was treated differently than his siblings. Setting boundaries was discussed during the session. Ms. Henry noted Plaintiff had made fair progress.

On January 12, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 864-865). Plaintiff reported that a friend he met in rehab was passing through town and they had lunch. Plaintiff then had a dream about using again but thought it was linked to his friend coming to town. Plaintiff reported a little paranoia with hearing and seeing things. Plaintiff said his television talked to him when it was turned off. Plaintiff also indicated that when he went out to eat his back had to be against a wall. Ms. Henry suggested psychological testing as these were symptoms of schizophrenia. Plaintiff denied using substances. Ms. Henry noted Plaintiff had made fair progress.

On January 16, 2017, Plaintiff was seen at the Western Arkansas Counseling and Guidance Center for a psychiatric assessment performed by Colleen Atchley, DNP, APRN.  (Tr. 466-468). Nurse Atchley noted Plaintiff was being treated for a generalized anxiety disorder, alcohol use disorder and stimulant use disorder. Plaintiff reported he felt "hopeless." Plaintiff reported he spent most of his time in his room out of fear of losing control. Plaintiff reported he felt uncomfortable around people and that his wife had to drive because he would get so upset.  Plaintiff reported Seroquel helped reduce his symptoms but he was often reluctant to take it. Plaintiff reported he experienced headaches but denied memory problems, weakness, drowsiness, poor balance, joint pain, abdominal pain. Nurse Atchley noted Plaintiff's speech was of normal rate and tone, he had appropriate judgment and insight, he had appropriate concentration, and his intelligence was thought to be in the average range. Nurse Atchley prescribed medication and therapy.

On January 19, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 866-867). Plaintiff reported things were going okay. Plaintiff indicated an improvement with his thoughts with the change in medication. Plaintiff reported some nightmares. Ms. Henry noted they discussed obsessive compulsive behaviors and how to cope with them.  Plaintiff denied wanting to hurt himself or others. Plaintiff denied substance abuse. Ms. Henry noted Plaintiff had made fair progress.

On January 24, 2017, Plaintiff was seen by Dr. Trent Johnson for right shoulder pain. (Tr. 394-396). Plaintiff reported a long standing history of right shoulder pain, but acknowledged this was the first time he had been evaluated for the problem. Plaintiff reported he had a history of traumatic dislocation of his right shoulder from playing football in high school. Plaintiff reported difficulty with reaching, lifting, and carrying heavy objects. Plaintiff also reported some transient right upper extremity numbness but denied neck pain. Dr. Johnson noted Plaintiff had a history of

7

depression with substance abuse, as well as psychosis, but reported this was controlled with medication. After examining Plaintiff, Dr. Johnson opined Plaintiff possibly had a SLAP tear and recommended Plaintiff initiate nonoperative management for his right shoulder. Plaintiff was referred to physical therapy for balancing and stabilizing exercises. A corticosteroid injection of the right shoulder was then administrated at this visit.

On February 14, 2017, Plaintiff was seen by Dr. Guthrey for a medication follow-up, testicular pain, and dizziness. (Tr. 482-486). Upon examination, Dr. Guthrey noted Plaintiff was healthy-appearing and ambulated normally. Plaintiff had good judgment, a normal mood and affect, and normal recent and remote memory. Plaintiff had left perineal swelling of the testes. Dr. Guthrey assessed Plaintiff with vitamin D deficiency, an inguinal lymphadenopathy and wheezing. Plaintiff was referred to a urologist.

On February 16, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 868-869). Plaintiff reported things were going well. Plaintiff reported he went out to lunch with his wife which Ms. Henry noted as a huge step due to his paranoia. Ms. Henry noted Plaintiff continued to work a couple of odd jobs. Plaintiff explained one job kept him busy due to it being an older man who moved from one job to the next. Plaintiff indicated he had visited his grandmother's grave twice and had added something to his tattoo to represent her. Plaintiff denied substance abuse. Ms. Henry noted Plaintiff had made fair progress.

On February 23, 2017, Plaintiff was seen at the Western Arkansas Counseling and Guidance Center by Nurse Atchley for a medication evaluation and refill. (Tr. 520-522). Plaintiff reported a notable reduction of anger. Plaintiff reported he felt the medications were working and

that others had also noticed a positive change. Upon evaluation, Nurse Atchley noted Plaintiff was cooperative and pleasant and had good eye contact.  Plaintiff's mood was noted as better and his affect was remarkably improved.  Plaintiff's memory was intact, his concentration was good, and his judgement and insight were fair to good but improved. Plaintiff was prescribed medication and encouraged to contact the clinic in case of decompensation of symptoms or side effects.

On March 8, 2017, Dr. Brett Alberty, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds; could stand and/or walk for a total of six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry;  could occasionally reach overhead with the right upper extremity; should avoid all exposure to hazards; and that postural, visual and communicative limitations were not evident.  (Tr. 87-89). On June 26, 2017, after reviewing the records, Dr. Ronald Crow affirmed Dr. Alberty's opinion. (Tr. 124-126).

On March 9, 2017, Dr. Jon Etienne Mourot, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some areas of functioning. (Tr. 89-92).  On the same date, Dr. Mourot completed a Psychiatric Review Technique form opining that Plaintiff had moderate difficulties with understanding, remembering and applying information; moderate difficulties interacting with others; moderate difficulties in maintaining concentration, persistence and pace; and mild difficulties with adapting and managing oneself.  (Tr. 85).  On July 31, 2017, after reviewing the records, Dr. Laurie Clemens affirmed Dr. Mourot's opinion. (Tr. 129).

On March 24, 2017, Plaintiff was seen by Dr. Guthrey complaining of a hernia, lower back pain and bipolar disorder. (Tr. 495-498). Dr. Guthrey noted Plaintiff would be seeing Dr. Terrel for his hernia; that his lower back pain was fairly stable; and that his moods were stable and he would follow-up with a psychiatrist. Upon examination, Dr. Guthrey noted Plaintiff was healthy-appearing and ambulated normally.  Plaintiff had good judgment, a normal mood and affect, and normal recent and remote memory.  Plaintiff exhibited a full range of motion in his neck. Plaintiff had an inguinal hernia on the right.  Plaintiff had normal muscle strength and tone and normal movement of all extremities.  Plaintiff was referred to a urologist for his hernia. Plaintiff was to take ibuprofen for his back pain.

On March 29, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 870-871). Plaintiff reported he finally got his insurance worked out.  Plaintiff reported that he continued to have anger outburst about twice per week but they were not as bad. Plaintiff denied substance abuse.

On March 31 2017, a physician completed a headache form indicating Plaintiff would miss on average more than one day a week due to migraines.  (Tr. 476-477)

On April 7, 2017, Plaintiff was seen by Nurse Atchley for a medication evaluation and refill. (Tr. 608-610). Plaintiff reported that his mood had been good and he denied any severe mood swings. Plaintiff indicated he continued to struggle with mild paranoid ideation and intermittent restlessness. Plaintiff denied any excessive worry but had intermittent suspiciousness. Plaintiff reported adequate sleep, energy, and appetite. Plaintiff reported he was getting along better with family members and was more optimistic about the future. Upon evaluation, Nurse Atchley noted Plaintiff was cooperative and pleasant and had good eye contact.  Plaintiff's mood was noted as

10

pretty good and his affect was euthymic and bright.  Plaintiff's memory was intact, his concentration was good, and his judgement and insight were improved. Plaintiff was to continue with his medication.

On April 7, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 872-873). Plaintiff reported he had been staying busy. Plaintiff indicated he continued to struggle with paranoia and that he was not sleeping. Plaintiff reported a star in the sky had moved and it was discussed that this was probably a satellite. Plaintiff reported a decrease in mood related symptoms.  Plaintiff was noted to have made fair progress.

On April 10, 2017, Plaintiff was seen by Dr. Charles Gooden for an evaluation of a right inguinal hernia. (Tr. 513-516). Plaintiff reported a six month history of right groin pain that had progressively worsened. Plaintiff denied fatigue, musculoskeletal problems, neurological problems, or psychological problems. Upon examination, Dr. Gooden noted a small reducible umbilical hernia. Surgical repair was recommended.

On April 14, 2017, Plaintiff was admitted into the Sparks Regional Medical Center and underwent a laparoscopic inguinal hernia repair. (Tr. 504-512).

On April 27, 2017, Plaintiff was seen by Nurse Atchley for a medication evaluation and refill. (Tr. 523-525). Treatment notes indicated Plaintiff was a no show for his therapy appointments with Ms. Henry on April 12, 2017, and April 21, 2017. Plaintiff denied headaches, memory complaints, weakness, drowsiness, or poor balance. Nurse Atchley noted Plaintiff was cooperative and pleasant.  Plaintiff exhibited a normal gait. Plaintiff's mood was noted as normal and his affect was calm, neutral. Plaintiff exhibited an intact memory, good concentration and fair

insight and judgment. Plaintiff was prescribed medication and encouraged to contact the clinic in case of decompensation of symptoms or side effects related to medications.

On April 27, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 874-875). Plaintiff reported he had surgery to repair three hernias a couple of weeks ago. Plaintiff indicated he had been laying around and that it had been difficult for him not to be active. Plaintiff reported he had nightmares about going downtown and harming people but did not have access to a gun or an active plan. Plaintiff did not think his Seroquel was working as he only slept two to three hours a night. Ms. Henry noted Nurse Atchley and Plaintiff's wife were contacted and that it was decided to increase the Seroquel dosage. Plaintiff's wife agreed any deterioration of Plaintiff's mental status would be reported immediately.

On May 2, 2017, Plaintiff was seen by Dr. Gooden for a follow-up for an inguinal herniorrhaphy. (Tr. 576-578). Dr. Gooden noted Plaintiff had done very well since surgery. Plaintiff denied pain. Upon examination, Dr. Gooden noted no signs or symptoms of infection and that Plaintiff was doing well.

On May 2, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 876-877). Plaintiff reported he was sleeping again and feeling better. Plaintiff denied any thoughts of self-harm or harm to others. Plaintiff believed boredom and lack of sleep were the triggers to his mood change.

On May 11, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 878-879). Plaintiff reported things were going okay. Sleeping patterns and paranoia were discussed. Plaintiff indicated he stayed up all night one

night. Plaintiff denied any thoughts of self-harm or hurting anyone else. Plaintiff denied substance abuse.

On May 18, 2017, Plaintiff was seen for an individual therapy session with Ms. Henry to discuss his mood and behavioral symptoms. (Tr. 880-881). Plaintiff happily reported he was going to lunch with old friends after the session. Ms. Henry noted that this was a huge accomplishment given Plaintiff's paranoia. Plaintiff reported a friend would pick him up and that he had a lot of positive friends come around him. Plaintiff reported mood stability and no psychotic symptoms. Ms. Henry noted Plaintiff would be transferred to a new therapist.

On May 30, 2017, Plaintiff was seen by Dr. Gooden for a follow-up of an inguinal herniorrhaphy. (Tr. 574-576). Plaintiff reported the previous week he was doing some yardwork and shortly thereafter noticed some right inguinal pain that radiated to his testicle at times. Plaintiff also thought he had developed a recurrent bulge at this umbilicus. Plaintiff denied fatigue, shortness of breath, chest pain, nausea, muscle aches or weakness, headaches, dizziness, weakness, or numbness. Upon examination, Dr Gooden noted all appeared to be healing well and that there were no recurrent hernias appreciated at the umbilicus or in the right groin. Dr. Gooden opined this pain was due to muscle strain and recommended Plaintiff take ibuprofen.

On June 12, 2017, Plaintiff was seen for an individual therapy session with his new therapist, Ms. Robin "Jan" Moore, LCSW, to discuss his mood and behavioral symptoms. (Tr. 882-883). Ms. Moore noted Plaintiff discussed his addiction and progress. Plaintiff reported his desire to please his daughter and not to lose her due to his addiction.  Using self-talk to help maintain a brighter mood was discussed.  Ms. Moore noted good progress.

On July 13, 2017, Plaintiff was seen by Nurse Atchley for a medication follow-up. (Tr. 544-546). Treatment notes indicated Plaintiff missed his last appointment because "he had a lot going on." Plaintiff denied any severe mood swings. Plaintiff reported two close friends had died since his last appointment. Despite these losses, Plaintiff reported he was optimistic about the future. Plaintiff indicated he was getting along well with his wife and others. Nurse Atchley noted Plaintiff was cooperative and pleasant. Plaintiff described his mood as "pretty good" and he had a euthymic, calm affect. Plaintiff exhibited an intact memory, good concentration and fair to good judgment and insight. Plaintiff denied medication side effects. Plaintiff was to continue to take his medication as prescribed and encouraged to attend all appointments.

On July 28, 2017, Plaintiff underwent a mental status evaluation performed by Dr. Terry L. Efird. (Tr. 538-542). Plaintiff reported he applied for disability secondary to anxiety and depression. Plaintiff reported a depressed mood most of the time. Plaintiff reported he had been seeking outpatient mental health services for about six months. Plaintiff reported he took his medications as prescribed and denied experiencing side effects. Plaintiff reported the ability to perform basic self-care tasks independently; and to perform household chores adequately with reminders. Plaintiff last worked in a factory until the plant closed. Plaintiff reported problems in relationships with coworkers and supervisors. Plaintiff denied the use of alcohol or illegal substances for eleven months. Dr. Efird noted Plaintiff reported having heard voices since rehabilitation. Dr. Efird assessed Plaintiff with major depressive disorder, moderate to possibly severe, with possible psychotic features; a generalized anxiety disorder; polysubstance dependence, reportedly in remission for eleven months. Dr. Efird noted Plaintiff report that his driver's license was suspended three years ago due to nonpayment of child support. Plaintiff's ability to shop independently was impacted by anxiety. Plaintiff indicated he could perform

14

activities of daily living adequately but needed reminders. Plaintiff reported he used Facebook daily and talked to a friend on the telephone one to two times per month.  Plaintiff described himself as having been fairly socially isolated for eleven months. Dr. Efird noted Plaintiff communicated and interacted in a reasonably socially adequate manner.  Plaintiff was noted to communicate in a reasonably intelligible and effective manner. Dr. Efird opined Plaintiff had the capacity to perform basic cognitive tasks required for basic work-like activities. Dr. Efird noted Plaintiff appeared able to track and respond adequately for the purposes of the evaluation but that Plaintiff might have difficulty with immediate auditory attention span.  Dr. Efird opined Plaintiff appeared to have the mental capacity to persist with tasks if desired.

On August 1, 2017, Plaintiff was seen for an individual therapy session with Ms. Moore to discuss his mood and behavioral symptoms. (Tr. 884-885).  Plaintiff's behavior, affect and cognition were noted to be within normal limits. Plaintiff reported he attended NA meetings weekly. Plaintiff indicated he was not as confident about his anger management. Plaintiff talked about unruly children bothering him and noisy people irritating him. Plaintiff reported he took his dog for a walk to calm himself, as he constantly had racing thoughts. Ms. Moore noted Plaintiff worried about public places as people irritate him.

On August 3, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his right shoulder. (Tr. 648-649).  Plaintiff reported a corticosteroid injection provided excellent pain relief initially. Plaintiff indicated the therapy program also helped. Plaintiff reported over the past two months his right shoulder pain had increased and was worse when he reached out. Dr. Johnson noted Plaintiff's mental illness was currently stable and improving. Plaintiff also reported some low back pain.  After examining Plaintiff, Dr. Johnson recommended Plaintiff undergo a MRI arthrogram of the right shoulder and also physical therapy for his lumbar spine.

On August 15, 2017, Plaintiff was seen James A. Honey for a physical therapy evaluation. (Tr. 685-703). Plaintiff complained of lower back pain accompanied with intermittent bilateral lower extremity radicular symptoms. Plaintiff reported an increase in his spinal symptoms after he helped a friend build a retaining wall. Plaintiff also reported he was to see Dr. Johnson for his right shoulder later in the day. Plaintiff was instructed to do McKenzie exercises.

On August 15, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his right shoulder. (Tr. 803-804, 651-684). Dr. Johnson noted Plaintiff continued to be fairly symptomatic with pain with overhead reaching and lifting. Dr. Johnson noted that a MRI revealed Plaintiff had a near full thickness tear of the rotator cuff and supraspinatus. After discussing treatment options with Plaintiff, it was decided he would undergo a right shoulder arthroscopy with rotator cuff repair.

On August 21, 2017, Plaintiff underwent a right shoulder arthroscopy with rotator cuff repair performed by Dr. Johnson. (Tr. 704-766). Plaintiff was to use a sling essentially full time, except for hygiene.

On September 5, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his right shoulder. (Tr. 809-811, 912). Plaintiff reported he was doing well. Plaintiff reported minimal pain and his compliance with the use of the sling. Plaintiff indicated he had been doing his pendulum and elbow motions. Plaintiff was to return in three weeks for an evaluation.

On October 5, 2017, Plaintiff was seen at The Guidance Center for a medication management appointment. (Tr. 846-848). Plaintiff reported a decreased pleasure in doing things, feeling down, and worrying.  Plaintiff indicated most of his anxiety and frustration related to a disagreement with his daughter. Plaintiff also continued to struggle with grief and the loss of his

grandmother one year ago. Plaintiff recently resolved legal issues related to child support. Plaintiff reported he saw a ghost two nights ago and that he heard "things" around his home.  Plaintiff denied memory problems, weakness, sedation, joint pain or swelling or pain. The examiner noted Plaintiff had fair eye contact but was tearful when discussing his frustration with his daughter. Plaintiff was found to have fair judgment but his insight was impaired due to health literacy. Plaintiff was to continue to take medication as prescribed.

On October 17, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his right shoulder.  (Tr. 811-812). Plaintiff reported his pain and range of motion were improving.  Plaintiff reported he had discontinued the use of the sling and had not had any significant limitations on the right side. Plaintiff reported issues with compliance with no lifting activities with his right shoulder.  Plaintiff was very pleased with the surgical result. Dr. Johnson referred Plaintiff to physical therapy and recommended no heavy lifting, greater than five pounds, on the right side. Plaintiff was to return in one month for a follow-up appointment.

On October 26, 2017, Plaintiff was seen by Anita K. Doubrava for a physical therapy evaluation. (Tr. 772-792).  Plaintiff reported he had done very well since surgery and did not know he was not supposed to use his arm.  Plaintiff reported he had been using an ax.  Ms. Doubrava indicated she discussed the proper level of activity for the arm.

On November 7, 2017, Plaintiff was seen at The Guidance Center for individual therapy with Ms. Moore. (Tr. 844-845). Ms. Moore noted Plaintiff asked her to complete a disability form. Plaintiff indicated his attorney had told him to say most of the check marks needed to be in the severe category.  Ms. Moore noted she told Plaintiff that she could fill out the form, but had to be

truthful. Plaintiff reported that he had remained clean and sober and felt so much better without these substances.

On November 10, 2017, Ms. Moore completed a Mental Medical Source Statement opining Plaintiff had mild limitations with understanding and remembering simple instructions and carrying out simple instructions. (Tr. 824-826). Ms. Moore opined Plaintiff had moderate limitations with making judgements on simple work-related decisions, interacting appropriately with the public, and interacting appropriately with co-workers. Ms. Moore opined Plaintiff had marked limitations with understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions and responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 824-826).

On November 16, 2017, Dr. Johnson completed a medical source statement opining Plaintiff could lift or carry thirty pounds. (Tr. 814-816). Dr. Johnson opined Plaintiff's standing, walking, and sitting were not impacted by his impairment. Plaintiff was limited to lifting nothing greater than twenty pounds overhead. Dr. Johnson opined Plaintiff had not reached maximum medical improvement.

On November 17, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his right shoulder. (Tr. 917-919). Dr. Johnson noted Plaintiff had been performing physical therapy and range of motion exercises and that Plaintiff's strength was improving. Plaintiff reported minimal pain. Plaintiff reported he still had some weakness in his right shoulder and had continued with physical therapy. Plaintiff denied any radicular or neurological symptoms or neck pain. After examining Plaintiff, Dr. Johnson noted Plaintiff had some weakness but that he continued to improve. Dr. Johnson recommended continued physical therapy.

On December 29, 2017, Plaintiff was seen by Dr. Johnson for a follow-up for his right shoulder pain. (Tr. 920-922). Plaintiff reported he still had some weakness and mild soreness of the right shoulder but had overall improved. Plaintiff reported he had some knee pain and requested a referral. After examining Plaintiff, Dr. Johnson recommended continued scapular stabilization and strengthening of the right shoulder. Dr. Johnson recommended continued range of motion exercises.

On January 10, 2018, Plaintiff was seen at The Guidance Center for a medication evaluation. (Tr. 818-822). Nurse Atchley noted that while Plaintiff was friendly and displayed a good sense of humor during the assessment, Plaintiff reported feeling down, depressed, and hopeless. Plaintiff reported he continued to have difficulty sleeping. Plaintiff continued to have a strained relationship with his daughter. Plaintiff reported he was helping a friend in early recovery. Plaintiff reported he was getting more comfortable at NA meetings. Plaintiff denied memory complaints or sedation. Plaintiff indicated he had some right shoulder discomfort. Nurse Atchley recommended some medication adjustments to boost Plaintiff's mood and reduce his anxiety. Plaintiff was to return in two months.

On February 27, 2018, Plaintiff cancelled his therapy appointment at The Guidance Center with Ms. Moore because he had a doctor appointment. (Tr. 834).

On February 28, 2018, Plaintiff was seen by Dr. Johnson for an evaluation of his bilateral knees.  (Tr. 923-924, 928-929). Plaintiff reported an aching and throbbing mainly about the anterior aspect of the knee that worsened with weightbearing and ambulating. After examining Plaintiff, Dr. Johnson assessed Plaintiff with bilateral knee patellar tendinitis with quadriceps and vastus medialis obliquitous atrophy. Dr. Johnson recommended physical therapy.

On March 12, 2018, Plaintiff did not show up for his therapy appointment at The Guidance Center with Ms. Moore.  (Tr. 832-833).

On March 29, 2018, Plaintiff was seen at The Guidance Center for individual therapy with Ms. Moore. (Tr. 828-831). Ms. Moore noted Plaintiff was cooperative and that his mood was depressed, anxious.  Plaintiff was noted to have intact judgment and insight.  Plaintiff reported two friends and his dog had died in the past month. Plaintiff reported his daughter continued to reject him and had been rude to him even when he was trying to help her.  Plaintiff was taking his medication as prescribed. Plaintiff reported he continued to be drug free and was handling his anger, depression, and anxiety better now.

On April 11, 2018, Plaintiff was seen at The Guidance Center for a medication management appointment.   (Tr. 945-949). Plaintiff reported feeling down, depressed, and hopeless. Plaintiff reported he often worried about family and financial stressors. Plaintiff reported his medication helped reduce his symptoms but he had not been sleeping well. Plaintiff reported he was attending AA meetings.  Plaintiff reported the loss of two good friends, one from a heart attack and the other in a high speed car crash.  Plaintiff indicated he had struggled with attending therapy. Plaintiff reported his doctor put off knee surgery because his ligament was just weak. Plaintiff indicated his insurance would not pay for physical therapy. Nurse Atchley noted Plaintiff exhibited normal attention and concentration and intact judgment and insight. Plaintiff exhibited a normal gait and station. Plaintiff was to continue with his treatment.

On April 16, 2018, Plaintiff was seen by Dr. Gooden for an evaluation for a possible recurrent hernia. (Tr. 908-910). Dr. Gooden noted Plaintiff experienced the onset of some left quadrant pain two weeks ago while doing some heavy lifting in the gym. Plaintiff also noticed

some right inguinal pain when he exerted himself and some blood in his stool periodically. Plaintiff denied fatigue, muscle aches, headaches, dizziness, weakness, or numbness.  Upon examination, Dr. Gooden noted Plaintiff had moderate tenderness over the adductor insertion on the left side. Plaintiff exhibited a normal gait and station. Dr. Gooden strongly suspected Plaintiff had an adductor strain.  Plaintiff was also referred for a colonoscopy.

On May 29, 2018, Plaintiff was seen by Dr. Johnson for a follow-up for his bilateral knee pain. (Tr. 925-927). Plaintiff reported he had been doing weights and that this had helped some. Plaintiff reported he took oral anti-inflammatories and did jumper's knees which helped. Dr. Johnson noted Plaintiff had been doing a fair amount of walking. Plaintiff denied calf symptoms, locking, catching or instability. Dr. Johnson recommended Plaintiff continue non-operative management.

On June 11, 2018, Plaintiff was seen at The Guidance Center for a medical management appointment. (Tr. 936-940). Plaintiff reported that he was pleased his daughter was talking to him again and that he had been able to attend her graduation. Plaintiff reported he played a little ball with his nephew as he was trying to be more active. Plaintiff reported restless sleep and that he sometimes thought he would be better off dead.  Plaintiff had no plan for self-harm. Nurse Atchley noted Plaintiff had appropriate eye contact and psychomotor activity.  Nurse Atchley noted Plaintiff sat kicked back and relaxed while grinning during the session. Plaintiff exhibited normal attention and concentration and had normal judgment and insight.

On August 30, 2018, Plaintiff was seen at The Guidance Center for a medication management appointment. (Tr. 932-935). Plaintiff reported he went to a big NA rally with a friend. Plaintiff denied recent intrusive thoughts but reported some worry and anxiousness most days.

Plaintiff reported he took his dog for a walk when he was down. Plaintiff reported he sometimes thought he would be better off dead but denied any plan or intention of harming himself. Nurse Atchley noted Plaintiff had appropriate eye contact, normal psychomotor activity, normal speech and a normal gait and station.  Plaintiff exhibited intact judgment and insight and had normal attention and concentration. No changes were made to Plaintiff's treatment plan.

On September 6, 2018, Plaintiff entered the Sparks Regional Medical Center emergency room with complaints of syncope. (Tr. 960-966). Plaintiff reported he was working in his yard when he experienced a syncopal episode. Plaintiff woke up when a friend tried to help him up off the ground. Plaintiff denied weakness, shortness of breath, chest pain, muscle pain or a headache. Upon examination, Dr. Ryan P. Sullivan noted Plaintiff was alert and in no acute distress. Plaintiff's back was nontender and he had normal musculoskeletal strength. Plaintiff exhibited normal coordination, finger-to-nose, and heel-to-shin exercises. A CT of the brain was negative. Plaintiff refused to be admitted. Plaintiff was discharged in stable condition with the recommendation to follow-up with his primary care physician in one to two days.

## III.    Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." Combs v. Berryhill, 878 F.3d 642, 645-46 (8th Cir. 2017).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Id.  The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id.  The Court will not reverse an administrative decision simply because some evidence may

support the opposite conclusion. <u>Perkins v. Astrue</u>, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. <u>Id</u>.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir.2001); <u>see also</u> 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. <u>See</u> 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. <u>See</u> <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1141-42 (8th Cir. 1982), <u>abrogated on other grounds by Higgins v. Apfel</u>, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520.

IV.   **Discussion:**

Plaintiff argues the following issues on appeal: 1) the ALJ's RFC determination is inconsistent with the record; and 2) Plaintiff cannot perform the jobs identified at Step Five

A.   **Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability. 42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on September 30, 2016. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of August 23, 2016, his amended alleged onset date of disability, through September 30, 2016, the last date he was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB, he must prove that on or before the expiration of his insured status he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984).

With respect to Plaintiff's SSI application, benefits are not payable prior to the date of application, regardless of how far back disability may, in fact, be alleged or found to extend. See 20 C.F.R. § 416.335. Therefore, the relevant period is from January 10, 2017, the date Plaintiff protectively applied for SSI benefits, through October 15, 2018, the date of the ALJ's decision.

B.   **Subjective Complaints and Symptom Evaluation:**

We now address the ALJ's assessment of Plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration,

24

frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id.  As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.  A review of the record revealed that Plaintiff completed a Function Report dated May 24, 2017, indicating that he was able to help take care of the dogs, to take of his personal hygiene, to prepare simple meals, to do yardwork like mowing and weed-eating, to drive, to shop for things at smaller stores, to watch television and read, and to spend time with his wife, son and close friend.  (Tr. 305-312).  The record further revealed Plaintiff's old boss offered him a job and he accepted in December of 2016; that he reported he got a job in March of 2017; that he attended AA meetings nightly; that he was able to attend his daughter graduation; that he attended a NA rally with a friend; and that he was able to work out in a gym during the time period in question. (Tr. 549, 860, 910, 932, 936, 944).

With respect to Plaintiff's alleged impairments, the record revealed that most of Plaintiff's impairments were treated conservatively and that Plaintiff appeared to experience some relief with the use of medication.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir.1998); See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims

of disabling pain).  As for Plaintiff's right shoulder, the medical records revealed a successful surgical repair and return of function.

Plaintiff argues that the ALJ did not properly address Plaintiff's mental impairments; however, the record revealed Plaintiff's mental health provider, repeatedly noted Plaintiff had normal attention and concentration, appropriate insight and judgment, and good memory.  (Tr. 467, 521, 545, 599, 609). While not Plaintiff's mental health provider, Dr. Johnson also noted Plaintiff's mental impairments were controlled with medication. (Tr. 394, 646). Impairments that are controllable or amenable to treatment do not support a finding of total disability. Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

With regard to a third-party statement completed by Plaintiff's wife, the ALJ properly considered this evidence but found it unpersuasive.  This determination was within the ALJ's province.  See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity.  Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible for the time period in question.

### C.    The ALJ's RFC Determination and Medical Opinions:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for

the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of treating and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform light work with limitations. The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of treating and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). The ALJ also took Plaintiff's obesity into account when determining Plaintiff's RFC. Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

D.     **Hypothetical Question to the Vocational Expert:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the

impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a blending tank tender helper, a groover and stripper operator, and a laminating machine off bearer during the time period in question. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.      Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 13th day of October 2020.

/s/   *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE